**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.:  12-CR-20482-KMM**

THE UNITED STATES OF AMERICA,                    Miami, Florida

              Plaintiff,                         August 29, 2012

v.

TROY DOUGLAS BRIMM,

              Defendant.                         Pages 1 - 86

------------------------------------------------------------------

**REDACTED TRANSCRIPT OF**
**JURY TRIAL**

BEFORE THE HONORABLE K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:              MARIA K. MEDETIS, AUSA
                                 FRANCIS VIAMONTES, AUSA
                                 99 Northeast 4th Street,
                                 Miami, Florida 33132

FOR THE DEFENDANT:               JOAQUIN PADILLA, AFPD
                                 BONNIE PHILLIPS-WILLIAMS, AFPD
                                 150 West Flagler Street,
                                 Suite 2001,
                                 Miami, Florida 33130

REPORTED BY:                     BONNIE JOY LEWIS, R.P.R.
                                 7001 Southwest 13 Street
                                 Pembroke Pines, Florida 33023
                                 (954) 985-8875
                                 caselawrptg@gmail.com

1              (Thereupon, the following proceedings was held:)

2              THE COURT:  You may be seated.

3  (Witness sworn.)

4              THE COURTROOM DEPUTY:  Thank you.  Please be seated.

5              Would you state your full name for the record.

6              THE WITNESS:  David Reid.

7              THE COURTROOM DEPUTY:  And spell it, please.

8              THE WITNESS:  Davy; D-A-V-Y, Reid; R-E-I-D.

9              THE COURTROOM DEPUTY:  Thank you.

10             MS. MEDETIS:  May I proceed, Your Honor?

11             THE COURT:  All right.

12                          DIRECT EXAMINATION

13  BY MS. MEDETIS:

14  Q.    Good morning, sir.

15  A.    Good morning.

16  Q.    Where do you work?

17  A.    United States Marshal Service.

18  Q.    And what is your title?

19  A.    Deputy United States Marshal.

20  Q.    And what are your duties and responsibilities there?

21  A.    My duties are and include protection in federal courts and

22  judges, courtroom security, asset forfeiture, operations in

23  management, fugitive apprehension and a few others.

24  Q.    As part of your duties and responsibilities as deputy marshal

25  with the United States Marshal Service, do you participate in the

1 intake of individuals who are arrested and brought to the Federal

2 Detention Center in Miami Florida?

3 A.   Yes.

4 Q.   And as part of that intake process, do you take the

5 fingerprints of those individuals who are arrested?

6 A.   Yes.

7 Q.   I have just shown what has been marked for identification

8 purposes as Government's Exhibit and given to defense counsel.

9          Your Honor, may I approach?

10          THE COURT:  All right.

11 BY MS. MEDETIS:

12 Q.   Sir, could you please examine what has been marked for

13 identification as Government's Exhibit 20.  Do you recognize that,

14 sir?

15 A.   Yes.

16 Q.   Okay.  And can you tell us what that is?

17 A.   It's a --

18 Q.   In general terms and not specifically.

19 A.   It's a fingerprint card.

20 Q.   Okay.  And is that the type of fingerprint card that the United

21 States Marshal Service uses to fingerprint individuals who are

22 brought into FDC?

23 A.   Yes, ma'am.

24 Q.   And by FDC, I mean Federal Detention Center; is that right?

25 A.   Yes, ma'am.

1  Q.    And is this the type of fingerprint card that you specifically

2  would use to take the fingerprints of somebody?

3  A.    Yes, ma'am.

4  Q.    And after you take -- well, describe that process.  How do you

5  take the fingerprints of someone?

6  A.    Well, initially, we get them in.  We have them wash their

7  hands, put on gloves, and then have them dry their hands.  And then,

8  they roll their fingerprints on a live scan machine.

9  Q.    What is a live scan machine?

10  A.    It's similar to a copy machine.  As you roll the fingers it

11  scans as you roll it from fingertip to fingertip and from side to

12  side and it just copies and it goes into the computer.

13  Q.    And what happens to the fingerprints once it is scanned?  Where

14  does it go?

15  A.    It is uploaded to a computer and then it goes through this --

16  to a JABS, Joint Automated Booking System, that goes to the FBI.

17  Q.    And are you able to access those fingerprints in your capacity

18  as a deputy marshal?

19  A.    Yes, ma'am.

20  Q.    And how would you access them?

21  A.    I would go through the JABS system, the Joint Automated Booking

22  System and view it from there.

23  Q.    I'm sorry.  Could you repeat that?  What does JABS stand for?

24  A.    Joint Automated Booking System.

25  Q.    Okay; JAB.

1  A.    JABS.

2  Q.    And so this type of fingerprint card, how would you be able to

3  create that --

4  A.    Well --

5  Q.    -- since the fingerprints are on the computer?

6  A.    We just type in the person's name that we input and his marshal

7  number, his registered number, and we just access it and it comes up

8  and we just print it up.

9  Q.    Okay.  So this sort of document, this fingerprint card, is this

10  the sort of document that you, or the Marshal Service, or the FBI,

11  would maintain in the regular course of your activities?

12  A.    Yes, ma'am.

13  Q.    And the card that you have before you as Government's Exhibit

14  number 20, what is the name of the person who is printed on that

15  card?

16  A.    Troy Douglas Brimm.

17  Q.    And could you read for us the marshall number that you referred

18  to?

19  A.    The marshal number is not on here.  It just says the Social.

20  Q.    Just the Social Security number.  Okay.  Could you read that,

21  please?

22  A.    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.

23          MS. MEDETIS:  Your Honor, at this time, we would seek to

24  admit Government's Exhibit 20 into evidence.

25          MR. PADILLA:  No objection, Judge.

1          THE COURT:  It will be admitted.

2          MS. MEDETIS:  Permission to publish to the jury.

3          THE COURT:  You may.

4          MS. MEDETIS:  May I approach?

5          THE COURT:  You may.

6    BY MS. MEDETIS:

7    Q.   What you see on your monitor before you?  Is that the printed

8    card that we were just talking about?

9    A.   Yes.

10   Q.   Okay.  And I'm just going to ahead and turn it around.

11        And you had pointed out that there was a Social Security number

12   of the individual whose prints you took.

13        Where is that?  Could you point on the monitor, please.

14   A.   This, right here (indicating).

15   Q.   Okay.  And the date of birth for the person who was

16   fingerprinted, what is that?

17   A.   4/26 1962.

18   Q.   And can you point to that on the monitor?

19   A.   (Complied.)

20   Q.   Now, the individual, you took these prints, correct?

21   A.   Correct.

22   Q.   And do you see the individual who you printed and whose prints

23   are captured on this exhibit?

24   A.   Yes.

25   Q.   Okay.  Could you identify him?  Do you see him in the courtroom

1 today?

2 A.   Yes.

3 Q.   Could you identify him and perhaps with an article of clothing

4 as well?

5 A.   He's wearing, I believe, a navy blue suit with a light blue

6 shirt, glasses, and bald head.

7          MS. MEDETIS:  Your Honor, for the record, we would ask that

8 the record reflect that the witness identified the defendant.

9          THE COURT:  The record so reflects.

10          MS. MEDETIS:  Your Honor, we would tender the witness.

11          THE COURT:  Cross?

12          MR. PADILLA:  No, Judge.

13          THE COURT:  Thank you.  You may step down.

14          MS. MEDETIS:  The United States calls Kenneth Wyatt.

15 (Witness sworn.)

16          THE COURTROOM DEPUTY:  Thank you.  Please be seated.

17          Would you state your full name for the record.

18          THE WITNESS:  Kenneth Wyatt.

19          THE COURTROOM DEPUTY:  And spell it, please.

20          THE WITNESS:  W-Y-A-T-T.

21          THE COURTROOM DEPUTY:  Thank you.

22                      DIRECT EXAMINATION

23 BY MS. MEDETIS:

24 Q.   Good morning, Mr. Wyatt.  How you are you?

25 A.   Okay.

1  Q.   Could you please introduce yourself to the members of the jury?

2  A.   Yes.  I work for Miami-Dade Police Department.  I'm a

3  fingerprint analyst with the Miami-Dade Police Department.

4  Q.   How long have you been an analyst with the Miami-Dade Police

5  Department?

6  A.   For 23 years.

7  Q.   Prior to working with the Miami-Dade Police Department where

8  did you work?

9  A.   FBI.

10 Q.   In what capacity?

11 A.   Fingerprints.

12 Q.   In total, how many years have you had worked as a fingerprint

13 analyst?

14 A.   For 28 years.

15 Q.   What are your duties and responsibilities as a fingerprint

16 analyst?

17 A.   Analyzing and verifying identifying fingerprints, printing

18 victims from accidents from JMH, testifying in court.

19 Q.   In addition to your 28 years of experience as a fingerprint

20 analyst, have you received any specialized training, formal training

21 to be a fingerprint analyst?

22 A.   Yes.

23 Q.   Okay.  Can you briefly describe that for the members of the

24 jury?

25 A.   Yes.  As I stated before, I worked for the FBI for five years.

1  They provided training in a fingerprint class for four months and I

2  worked for five years in the identification section.

3  Q.   Have you briefly testified in federal court as an expert in

4  fingerprint analysis?

5  A.   Yes.

6  Q.   How many times?

7  A.   At least 40 times.

8  Q.   Have you ever been tendered as an expert in fingerprint

9  analysis and not been allowed to give your expert opinion in court?

10  A.   No.

11        MS. MEDETIS:  Your Honor, at this time, I would tender the

12  witness as an expert in fingerprint analysis.

13        MR. PADILLA:  No objection, Judge.

14        THE COURT:  All right.

15  BY MS. MEDETIS:

16  Q.   Mr. Wyatt, first I'm going to ask you some questions about

17  fingerprints in general.  Could you please describe for the members

18  of the jury what a fingerprint is?

19  A.   A fingerprint is like a standard of a fingerprint of an

20  individual and it's unique.  Everybody has different

21  characteristics.  Nobody has the same fingerprints or the same.

22  They're very different.

23  Q.   Okay.  And are you familiar with a known standard or an inked

24  print?

25  A.   Yes.

1   Q.    And could you describe what that means for the members of the

2   jury?

3   A.    An inked standard is when we fingerprint somebody with an inked

4   standard of their fingerprints and we will roll them on a tempered

5   fingerprint card.

6   Q.    Is that considered an intentional print?

7   A.    Yes.

8         MS. MEDETIS:  May I approach, Your Honor?

9         THE COURT:  All right.

10  BY MS. MEDETIS:

11  Q.    Mr. Wyatt, I've just handed you Government's Exhibit 20 in

12  evidence.  Do you recognize it?

13  A.    Yes.

14  Q.    What is it?

15  A.    It's a tempered fingerprint standard FD-249.

16  Q.    And are your markings on that fingerprint card?

17  A.    Yes.

18  Q.    Would you describe for the members of the jury why your

19  markings are on that fingerprint card?

20  A.    My initials and date are on here because I identified the

21  fingerprints to another set of standards.

22  Q.    Describe what that means to the jury.  You compared, you said,

23  that set of prints to other prints.  What did you do in this case to

24  compare prints?

25  A.    I prepared a set of standards against the previous convictions

1  of the defendant and determined they were the same person.

2  Q.   Government's Exhibit 20 before you, what is that?  Is that the

3  known standard?

4  A.   Yes.

5       MS. MEDETIS:  For the record, I have shown defense counsel

6  Government's Exhibit 21 for identification.

7       May I approach, Your Honor?

8       THE COURT:  All right.

9  BY MS. MEDETIS:

10  Q.   Mr. Wyatt, I have now handed you Government's Exhibit 21 for

11  identification.  Can you tell the members of the jury what that is?

12  A.   Yes.  It is an inked standard on a criminal registration form,

13  the notice of a sexual offender registration requirement.

14  Q.   And do you recognize that form?

15  A.   Yes.

16  Q.   Does that form have a thumbprint on it?

17  A.   Yes, it does.

18  Q.   Is that form in substantially the same condition it was in when

19  you used it in this comparison?

20  A.   Yes.

21  Q.   And did you keep that in the regular course of your business

22  with your responsibilities as a fingerprint analyst for the

23  Miami-Dade Police Department?

24  A.   Yes.

25       MS. MEDETIS:  Your Honor, at this time, I would move

1  Government's Exhibit 21 for identification into evidence.

2              MR. PADILLA:  No objection.

3              THE COURT:  It will be admitted.

4              MS. MEDETIS:  Could we have the camera that shows it for

5  the members of the jury?  Okay.

6  BY MS. MEDETIS:

7  Q.   Mr. Wyatt, let's talk a little bit about how you did your

8  comparison in this case.

9       What did you do in order to come up with an opinion of the

10 fingerprint on this sex registration form is the same as the known

11 standard?

12 A.   I put the standards side by side with a glass I have at the

13 office.  And I look at the two impressions and I compare them side

14 by side to make sure that they're one and the same person.

15 Q.   You said you look at them with a glass.  What do you mean by

16 that?

17 A.   That's what we use to look at fingerprints.

18 Q.   Is it a magnifying glass?

19 A.   Yes.

20 Q.   And would you describe for the members of the jury what you're

21 looking for when you compare those two prints side by side?

22 A.   Points of identification.

23 Q.   What are points of identification?

24 A.   They are bifurcations, islands, ending ridges, point lines.

25 Q.   How many points of identification were you looking for?

1  A.    There's no set amount.

2  Q.    But you, how many points did you look for in order to give an

3  opinion that they are, in fact, the same person?

4  A.    At this time, I settled with twelve.

5  Q.    And did you find these twelve points of identification on

6  Government's Exhibit 20, the known standard, and Government's

7  Exhibit 21, which is the sex offender form before you?

8  A.    Yes.

9  Q.    Did you reach an opinion as to whether the thumbprint on the

10 sex offender registration form is the same person as the rolled

11 prints on Government's Exhibit 20?

12 A.    Yes.

13 Q.    And what is your opinion?

14 A.    They're the same person.

15 Q.    They were a match?

16 A.    Yes.

17        MS. MEDETIS:  May I approach, Your Honor?

18        THE COURT:  All right.

19        MS. MEDETIS:  For the record, I have shown defense counsel

20 Government's Exhibit 22 for identification.

21 BY MS. MEDETIS:

22 Q.    Mr. Wyatt, I'm going to ask that you not put that under the

23 camera yet.  And Mr. Wyatt, I showed you Government's Exhibit 22 for

24 identification.  Do you recognize it?

25 A.    Yes.

1  Q.    What is it?

2  A.    It's a notice of sexual offender registration form for sexual

3  registration requirements.

4  Q.    And if you could move Government's Exhibit 21 away from the

5  camera.  Referring to Government's Exhibit 22, for identification,

6  what is the date on that sex offender registration form?

7  A.    Dated November 8, 2006.

8  Q.    Did you perform the same analysis on Government's Exhibit 22 as

9  you previously testified about with regard to Government's Exhibit

10  21?

11  A.    Yes.

12  Q.    Did you compare that registration form to the known standard,

13  Government's Exhibit 20?

14  A.    Yes.

15  Q.    Did you also keep that form in the regular course of your

16  business as a fingerprint analyst?

17  A.    Yes.

18       MS. MEDETIS:  Your Honor, at this time, the government

19  would move Government's Exhibit 22 for identification into evidence

20  as Government's Exhibit 22.

21       THE COURT:  It would be admitted.

22  BY MS. MEDETIS:

23  Q.    Based on your analysis of Government's Exhibit 22, did you come

24  to an opinion as to whether that is a match to the known standard,

25  Government's Exhibit 20?

1  A.   Yes.

2  Q.   Was it a match?

3  A.   Yes.

4  Q.   Mr. Wyatt, are these your markings on the known fingerprints?

5  A.   Yes.

6  Q.   And do you see the name of the person that was rolled?

7  A.   Yes.

8  Q.   And what's that name?

9  A.   Troy Brimm.

10 Q.   Showing you on the overhead Government's Exhibit 21 in

11 evidence, do you see the name of the person whose fingerprints are

12 on that form?

13 A.   Yes.

14 Q.   What is that person's name?

15 A.   Troy Brimm.

16 Q.   And I apologize, the date of that form, when was that signed?

17 A.   January 7th of 2003.

18 Q.   And what is the name of the person that put their thumbprint on

19 this form?

20 A.   Troy Brimm.

21 Q.   And what is the date that that thumbprint was taken?

22 A.   November 8th, 2006.

23 Q.   And Mr. Wyatt, just like you worked Government's Exhibit 20

24 after you performed your analysis here, are these your markings?

25 A.   Yes.

1  Q.   Did also put your markings on the forms that you compared?

2  A.   Yes.

3  Q.   Can you point them out to the members of the jury?

4  A.   My initials are at the bottom right-hand corner.

5  Q.   Could you point to them?

6  A.   Right here (indicating).

7  Q.   Showing you on the overhead Government's Exhibit 22.  Are your

8  markings on this form as well?

9  A.   Yes.

10  Q.   And can you point them out to the members of the jury?

11  A.   (Indicating).

12          MS. MEDETIS:  I tender the witness, Your Honor.

13          THE COURT:  Cross?

14          MR. PADILLA:  Nothing, Judge.

15          THE COURT:  Thank you.  You may step down.

16          Call your next witness.

17          MS. MEDETIS:  Your Honor, the United States would call Dean

18  Lumpkin.

19          MR. PADILLA:  Judge, we would renew our objection as to

20  this witness.

21          THE COURT:  All right.

22  (Witness sworn.)

23          THE COURTROOM DEPUTY:  Thank you.  Please state your full

24  name for the record.

25          THE WITNESS:  Dean Alvin Lumpkin.

1          THE COURTROOM DEPUTY:  And would you spell your last name,

2   please.

3          THE WITNESS:  L-U-M-P-K-I-N.

4          THE COURTROOM DEPUTY:  Thank you.

5                         DIRECT EXAMINATION

6   BY MS. MEDETIS:

7   Q.   Good morning, sir.

8   A.   Good morning.

9   Q.   Mr. Lumpkin, may I call you Dean?

10  A.   Yes.

11  Q.   Dean, can you tell us where you live now?

12  A.   In Bosie, Idaho.

13  Q.   And what do you do there?

14  A.   I work at the Regional Medical Center for a physician's medical

15  group.

16  Q.   And can you tell us when were you born?

17  A.   In 1976, February 25th.

18  Q.   And where were you born?

19  A.   In Modesto, California.

20  Q.   Do you know an individual by the name of Troy Douglas Brimm?

21  A.   Yes, I do.

22  Q.   Do you see him in the courtroom today?

23  A.   Yes.  He's right over there in the glasses (pointing).

24          MS. MEDETIS:  For the record, Your Honor, we ask that the

25  record identify that the witness has identified the defendant.

1          THE COURT:  The record so reflects.

2   BY MS. MEDETIS:

3   Q.   Can you tell the ladies and gentlemen of the jury, how you know

4   the defendant?

5   A.   When I was 17 years old, I had just turned 17, I was hanging

6   out at a gay bar and I obviously was not old enough to go into the

7   bar, so the younger kids would hang out outside.

8          And Troy Brimm had approached me and said that I was a good

9   looking boy and not to leave.  So I stayed outside the bar until

10  Troy came out of the bar and picked me up that night.

11  Q.   Okay.  And you said that you had just turned 17.  What year was

12  that?

13  A.   1993.

14  Q.   Do you remember what the name of the bar was that you were

15  outside of?

16  A.   It was called the Brave Bull on 9th Street.

17  Q.   And where was that in?

18  A.   It was on 9th Street.

19  Q.   What state?

20  A.   Modesto, California.

21  Q.   Okay.  When the defendant came back out, what happened next?

22  A.   He just came back out and asked me to -- if I would like to get

23  in his car and go to an after-hours party.  And so we proceeded to

24  go to an older couples' house.  And then, Troy had taken me out to

25  the back yard and it was a very, very large back yard.  I mean, it

1  was huge.  And then, from that point on, we just started kissing and

2  fondling.

3  Q.   Okay.  What else happened that night?

4  A.   Troy took me back to his house where we just had continued to

5  -- a lot of frontage the first night where we were in our underwear

6  and rubbing against each other and then we proceeded to have oral

7  sex.

8  Q.   And when you say, proceeded to have oral sex, can you describe

9  that in more detail?

10 A.   Troy would just take down my underwear and proceeded to go down

11 on me.

12 Q.   So the defendant administered oral sex to you.  Did you do the

13 same to the defendant?

14 A.   Yes, I did.

15 Q.   Did you engage in sexual intercourse that night with the

16 defendant?

17 A.   Not that night, no.

18 Q.   What happened after that first night?

19 A.   After the first night we had just -- I had gone -- he took me

20 back to the place I was staying at in Ceres, California and he said

21 that he didn't like the environment that I was in there.  And so he

22 just proceeded to ask me if I wanted to go ahead and stay with him.

23 Q.   Okay.  Where were you living at that point when the defendant

24 asked you to live with him?

25 A.   I was living with a couple.  One of the gentleman had cerebral

1 palsy and he was like 60 years old and they were both gay and I was

2 just sleeping on the couch.  And at that point, I was kind of couch

3 hopping and staying with friends and stuff and I was staying in

4 Ceres.  And I had only been there a couple of days or even maybe a

5 week when I met Troy and then he just offered me a place to live.

6 Q.   And why were you, in your words, couch hopping at 17 years old?

7 A.   I just had a rough childhood with an alcoholic uncle and there

8 was like eleven of us.  And I was -- we were living in a one-bedroom

9 house.  And so it was just -- it wasn't a good situation.  So I just

10 decided to go ahead and leave.

11 Q.   Were you still in school at that point?

12 A.   Yes.

13 Q.   What grade in school were you in?

14 A.   I was in tenth.

15 Q.   Okay.  So is it accurate to say that you ran away from home?

16 A.   Yes.

17 Q.   So tell us what happened after the defendant asked you to live

18 with him.  What did you do?

19 A.   Well, we began just having a relationship.

20 Q.   Well, did you move in with him?

21 A.   Yes.  I moved Northwest him within just a couple of days of

22 knowing him.

23 Q.   Okay.  And where was that?  What location was the defendant

24 living at, at the time, and where did you move in with him?

25 A.   It was 3912 Peacock Lane In Modesto by the mall over there.

1  And like I said, I had just only known him for a couple of days, but

2  he asked me to move in with him.  So I moved in and --

3  Q.    And why did you move in with him?

4  A.    Because he had just promised to give me a more stable

5  environment, you know, a roof over my head and a place to eat and

6  clothes.

7  Q.    Okay.  And you said that when you moved in with him you had

8  started a relationship.  What do you mean by that?

9  A.    Well, we just began like a sexual relationship.  It was almost

10 like a kind of like a father/son relationship with sex.

11     I mean, he was taking care of me and we had just continued to

12 have sex.  And he was, you know, providing my clothes and my food

13 and my shelter.  And then, it just continued and we had sex on a

14 regular basis and showered together and --

15 Q.    When you say regular basis, how often would you have sex when

16 you first moved in with the defendant?

17 A.    Twice a day and then every day after that.

18 Q.    Okay.  And can you please describe, for the members of the

19 jury, what sort of sexual activity the defendant engaged in with

20 you?

21 A.    Well, most of the sex was oral sex.  Most of it was where he

22 was performing on me and then, I would also massage him and perform

23 oral sex on him.

24     And there were on a couple of occasions where we would have

25 anal sex, but that hurt too bad.  I didn't like it when he tried to

1  put his penis in me.  It was uncomfortable.  And then I had anal sex

2  with him where I would penetrate him and he would be on top.

3  Q.    And how old were you at this point?

4  A.    17.

5  Q.    Did the defendant force you in any way to do this?

6  A.    No.

7  Q.    And over the course of your relationship, your sexual

8  relationship with the defendant, while you were 17 -- well, let me

9  back up -- how long did your sexual relationship with the defendant

10 last?

11 A.    A couple of years.

12 Q.    Well, let's talk about when you were 17.  You said that you had

13 engaged in or the defendant gave you oral sex.

14       Did the defendant ask you to do anything else in that regard?

15 A.    Well, like I said, we would have a lot of oral sex.  And at one

16 point I hadn't -- I had a lot of hairs -- I have a lot of hair now,

17 but when I was younger for my age I had a lot of hair and he just

18 had me Nair myself just so I looked younger.

19 Q.    What do you mean Nair?

20 A.    Take the hair off my body.

21 Q.    What is Nair?

22 A.    It's a chemical that you use that if you put it on your body it

23 takes all the hair off.

24 Q.    Okay.

25 A.    And just, he said for a young person, I had a lot of hair and

1  if I had taken that off I would look younger and I know that Troy

2  liked me to look younger than I was.  So I wanted to do it for him.

3  Q.   Okay.  Dean, when you first met Troy did you tell him your real

4  age?

5  A.   Yes.

6  Q.   Did he say anything in response to that when you told him your

7  age?

8       Let me rephrase that.

9       How the defendant react when you told him your age?

10 A.   He seemed excited, actually.  There wasn't any type of problem

11 or anything like that, you know.  It was -- I was 17 and he was kind

12 of like, oh, that's cool, you know.  So there wasn't any kind of

13 problems.

14 Q.   Did he comment on whether you looked your age or not?

15 A.   He said that I looked younger than I was because I was 17.  And

16 gosh, at the time, people thought I was 14.

17 Q.   Okay.  You had just testified that you knew the defendant liked

18 younger boys.  How did you know that?

19          MR. PADILLA:  Objection, Judge; speculation.

20          THE COURT:  Overruled.

21          THE WITNESS:  Can I answer?

22 BY MS. MEDETIS:

23 Q.   Yes.

24 A.   Throughout the course of our relationship, he would begin to

25 make comments and -- but even before he began to make comments -- I

1  would find child pornography pictures on his computer and it was

2  lots, lots, and lots of child pornography.

3  Q.    Could you describe that child pornography?

4  A.    There were pictures of like ten-year-olds, eight-year-olds.

5          MR. PADILLA:  Objection.

6          THE WITNESS:  I mean, even younger.

7          THE COURT:  Overruled.

8          MR. PADILLA:  This is not relevant to this witness'

9  testimony.

10 BY MS. MEDETIS:

11 Q.    You can go ahead.

12 A.    It was just awful.  There were so many -- so many young

13 pictures and some of the pictures of the boys were in -- it was

14 terrible -- tied to bed posts and objects and having sex with older

15 people and -- I mean, younger, younger kids having sex with older

16 people and there were hundreds of these pictures.  Hundreds of them.

17 It was awful to look at (crying).

18     So after, you know, I began to just ask Troy, you know, what

19 was it about the younger kids that he just liked so much.

20     And he would just say that, you know, he always has and that's

21 what he preferred.  He preferred younger boys and it turned him on

22 the most.

23     And so I just -- I stayed at the house and continued to have

24 sex with him.  And then, he would just -- like I said, he would make

25 comments to me about the 12-year-old that was mowing our lawn how he

1  would, you know, like to give him a sexual experience.  And he was

2  free with his comments about things like that, you know.  It just

3  didn't matter that we were in a relationship.  He just -- he was

4  just open and honest about his comments about liking younger boys.

5  Q.   Did he ever say to you what age of boy he preferred?

6  A.   He preferred under 15.

7  Q.   Did he say that to you?

8  A.   Yes, he did.

9  Q.   Why did you stay?

10 A.   Because I loved him.  And I was, you know, I had come from a

11 bad childhood and he was promising me a better life, you know.  Like

12 I said, clothes and a consistent meal and a roof over my head.  And

13 I began a sexual relationship with him and I trusted him and I loved

14 him.

15 Q.   The home that you lived in, the Peacock Lane address, was that

16 located near a school?

17 A.   Yes.

18 Q.   Was there anything significant about that location?

19       MR. PADILLA:  Judge, objection.

20       THE COURT:  Overruled.

21       THE WITNESS:  We -- it was just a couple of blocks from the

22 school.  And Troy's office used to sit facing the street where all

23 the school kids would walk by.  And we would sit in his office and

24 as the kids would walk by, he would just comment and say, oh, look

25 at their cute butts.

1          And I would be like, Troy, they're 12.  You know, I mean,

2   it's not a comment you should be making about a 12-year-old, I

3   thought.  And you know, so, but he said he enjoyed living close to

4   the school.  I mean, he got to see all the cute boys walk by.

5   Q.   Let's talk about the times when the defendant administered oral

6   sex to you.  How often was that?

7   A.   It was every day.  As the relationship went on it got less, you

8   know.  It got to the point where --

9   Q.   I'm sorry to interrupt.  Go ahead.

10  A.   It just got to the point where he was mainly giving me oral sex

11  before I would go out with friends and everything because he just

12  said that he knew that a young horny boy would want to have his

13  needs taken care of.

14         And he didn't necessarily want to be in a relationship with me

15  at that point, but he still didn't want me having sex with other

16  people.

17         So it just got to the point where he would go down on me right

18  before I went out with friends.  It was kind of like a ritual.  It

19  was before I went out with friends he would have me sit on a chair

20  and pull down my pants and have oral sex with me.

21  Q.   And where would he be positioned while you were sitting in the

22  chair?

23  A.   On his knees in front of me while I was on the chair.

24  Q.   And while he was giving you oral sex what would he do with his

25  hand?

1  A.    He would fondle my testicles and jack himself off.

2  Q.    And what would happen to you when he gave you oral sex?

3  A.    I would come in his mouth and he would swallow.

4  Q.    After he swallowed what would he do?

5  A.    He would just say that he liked it, that it tasted good.

6  Q.    When the defendant talked to you about his sexual attraction to

7  boys that were 15 or younger, did he ever comment on whether that

8  was legal or not?

9  A.    He -- he just used to say that he didn't think that it was

10  illegal, that he had said to me -- there was one point that he

11  thought the world would be a better place if adults were allowed to

12  have sex with kids.  And then, adults could give children their

13  first sexual experience and whether they were -- like, how was a

14  young boy to know whether he was straight or gay if he wasn't

15  allowed to have sexual experience at a young age with an adult --

16  with a man or an adult.

17      So he didn't think that it was illegal or -- I mean, he was an

18  adult and he knew it was illegal but --

19          MR. PADILLA:  Judge, objection, to what this witness

20  believes Mr. Brimm thought.

21          THE COURT:  Just tell us what he said.

22  BY MS. MEDETIS:

23  Q.    Can you just tell us what he said with respect to laws that

24  prevented adults having sex with children?

25  A.    That it shouldn't be illegal, that adults should be able to

1  have sex with children.

2  Q.    Did he ever talk about traveling to other countries?

3  A.    When we would talk about the legalities of it and everything,

4  he would say that in other countries -- you know, I was young and I

5  don't know the laws of other countries -- but he just said that

6  other countries allowed adults to have sex with kids and it was only

7  in the United States that it was so taboo for adults to engage in

8  sex with children, but a lot of the other countries it wasn't taboo,

9  that it was perfectly fine.

10  Q.    Did he name any countries, if you recall?

11  A.    I mean, the things that came up were probably like Thailand.

12  That's really the only country that I could think of like, you know,

13  when he would talk about the little Thai boys.

14  Q.    What would Troy say about the little Thai boys?

15  A.    That just in those countries that are in like Thailand and, you

16  know, it was more -- it was okay for adults to have sex with kids.

17  It wasn't as illegal as it was here in the United States, that there

18  was lots of adults having sex with kids in other countries.

19  Q.    Did he say whether he wanted to travel to those other

20  countries?

21  A.    He loved to travel.  So yes, he said that he would love to

22  travel to other countries.  I mean, he liked traveling.

23  Q.    Okay.  Dean, did there come a time when you went to a cabin

24  with the defendant?

25  A.    Yeah.  His mother owned a cabin up in Nora, California near

1  Jamestown and it was quite often that we would go up to that cabin.

2  Q.   Is there a particular instance that you recall happening at

3  that cabin?

4  A.   There was a time where we had gone up to the cabin and Troy and

5  I were laying in bed.  And just out of the blue, he just said that

6  if he could get my grandmother to trust him and that with if he

7  could ask my grandmother and that if he got my permission if he

8  would be able to -- if he would be able to give my cousin, Adam, his

9  first real sexual experience (crying).

10  Q.   How old was Adam at that time when he said that to you?

11  A.   Adam was 12.  So I just was like, what do you mean?  My cousin

12  is 12 years old.  You must be out of your mind if you think my

13  grandmother is going to be okay with you giving my 12-year-old

14  cousin his first real sexual experience.  It was insane.  I couldn't

15  believe it.

16  Q.   Okay.

17  A.   I couldn't even believe that he would bring that up to me.  I

18  mean, not only having sex with a 12-year-old, but to someone who he

19  was having a relationship with.

20       So after he said that -- after he made that comment, I was just

21  so hurt (crying).  That was so hurtful that --

22            MR. PADILLA:  Judge, I'm going to object.  There's no

23  question pending for this witness.

24            THE COURT:  Overruled.

25            MS. MEDETIS:  Judge --

1           THE WITNESS:  It was --

2  BY MS. MEDETIS:

3  Q.    What happened after he said that?

4  A.    Like I said, I was so shocked by it.  I was so shocked by the

5  fact that he would even bring that up to me that he would even say

6  that.  So we were way up in the mountains.

7       And I told Troy that I was going for a walk and I just got up

8  and I walked out of the cabin door.  And I just began to walk and

9  walk and walk.  And gosh, we were -- I don't remember, one hundred

10  miles from home and I just kept walking and didn't look back.  I

11  walked and walked and walked down that mountain hill.  I wasn't

12  about to go back into that cabin after that was said.  So I just

13  hitchhiked home.

14  Q.    Did you go back to the Peacock Lane address after that?

15  A.    Yeah, that's where I was living -- that's where we were living.

16  Q.    And even after the defendant said that about your 12-year-old

17  cousin, Adam, you still stayed with the defendant?

18  A.    I did.

19  Q.    Why is that?

20  A.    I just, you know, I just wanted someone to love me, you know,

21  and I had a bad enough life already.  And even though it was hell

22  living with Troy, it was still a lot better than some of the things

23  that I had endured as a child.

24       So I just, you know, I just decided to stay there.  I mean, I

25  thought of myself as being a strong person and that I wasn't going

1  to let myself be manipulated and that I wasn't going to be kicked

2  out of my own home because of his issues.  So I just stayed.

3  Q.    But that was Troy's fault, correct?

4  A.    Yes.

5  Q.    But did he make you feel like it was your home as well?

6  A.    It's a loaded question.  He gave me a roof over my head and he

7  helped me with food and he helped me with clothing.  Home is where

8  the heart is.  And I'll tell you what, my heart was not in that

9  home.

10  Q.    How long did you stay in Troy's apartment?

11  A.    In his house, I stayed a couple of years, you know, maybe even

12  a little over two years.  Even when he was incarcerated I stayed at

13  the house.

14  Q.    Let me stop you there.

15        Have you ever traveled outside the United States?

16  A.    No.

17  Q.    Okay.  You've never been to the Dominican Republic?

18  A.    No.

19  Q.    Do you know a Dominican boy by the name of Dxxxxx?

20  A.    No.

21  Q.    Do you know a Dominican boy by the name of Jxxx Axxxxxx?

22  A.    No.

23  Q.    Did the defendant, while you knew him, do any charity work?

24        MR. PADILLA:  Objection, Judge.

25        THE COURT:  Overruled.

1          THE WITNESS:  He used to do charity.  He used to do

2    computer work for Faith Home Teen Ranch.  It was a group home for

3    troubled teenage boys.

4    BY MS. MEDETIS:

5    Q.   And what did he do there?

6    A.   He would do computer work.  He did all their computer systems.

7    He would go in and he would donate computers.  And if they had a

8    computer problem, he would just go there and spend the day working

9    on their computers.

10   Q.   How old were the boys that were at that ranch?

11   A.   18 and under.  I mean, you couldn't be at a boy's ranch if you

12   were over 18.

13   Q.   And where was that located?

14   A.   Faith Home, it was on the outskirts of town.  It was either in

15   a place called, like the Crow's Landing area of Modesto.

16   Q.   But it was near Modesto?

17   A.   It was near Modesto.  I don't know.  It might have been -- only

18   been further out like Escalon or something like that.  I've never

19   been there.

20   Q.   So you never went with Troy?

21   A.   No.

22   Q.   And why is that?

23   A.   I asked to go a couple of times, but he just said that he

24   preferred to go and do that work by himself.

25        I mean, it was -- even though it was charity, it was his work.

1  So he would just prefer to go by himself.

2          MS. MEDETIS:  Your Honor, the government would tender the

3  witness.

4          THE COURT:  Cross?

5                      CROSS EXAMINATION

6  BY MR. PADILLA:

7  Q.   You met Troy when you were 17, correct?

8  A.   Yes.

9  Q.   And at that time, you didn't have a stable residence?

10  A.   Correct.

11  Q.   You bounced around town?

12  A.   Yes, stayed with friends.

13  Q.   Six or seven places you lived in around that time?

14  A.   I wouldn't say six or seven.  I would say more like three at

15  that time.

16  Q.   Right.  And you had no person really looking after you at that

17  point in your life, did you?

18  A.   No.

19  Q.   And the first time you met Troy was at a gay bar?

20  A.   Correct.

21  Q.   And you went into that gay bar by your own choice, correct?

22  A.   Yes.

23  Q.   You weren't working there?

24  A.   No.

25  Q.   It's a place where you would hang out?

1   A.   Yes.

2   Q.   You and your friends would hang out?

3   A.   Yeah.

4   Q.   To meet people?

5   A.   Yeah.

6   Q.   And you were 17 at the time?

7   A.   Yes.

8   Q.   And after you met Troy you began a relationship?

9   A.   Correct.

10  Q.   And that relationship was by choice?

11  A.   Yes.

12  Q.   He didn't force you into that relationship?

13  A.   No.

14  Q.   He didn't promise you anything in that first night in order to

15  get you to have a relationship with him?

16  A.   No.

17  Q.   And over the next couple of years you lived together?

18  A.   Yes.

19  Q.   In a committed relationship?

20  A.   I would not say it was committed.

21  Q.   Did you live together as -- well, let me rephrase that.

22       At some point during the relationship, did you live together as

23  boyfriends?

24  A.   Yes.

25  Q.   And during the course of your relationship, you and Troy would

1  go out in public as a couple?

2  A.    Yes.

3  Q.    And during the course of your relationship, you would go to

4  family events with Troy?

5  A.    Yes.

6  Q.    Holiday functions?

7  A.    Correct.

8  Q.    Birthday parties?

9  A.    No.   Just on a few occasions that maybe Thanksgiving or

10 something, maybe, up at the mom's cabin.

11 Q.    And Troy's mother would be there?

12 A.    Yes.

13 Q.    And Troy's family would be there?

14 A.    That's correct.

15 Q.    And they recognized you two as a couple?

16 A.    Yes.

17 Q.    And they accepted that?

18 A.    No.

19 Q.    They didn't accept that?

20 A.    No.   His mother was pissed off.

21 Q.    But she understood that you were together?

22 A.    She understood that we were together.   I wouldn't say she

23 accepted it.

24 Q.    But you came to those functions as a couple?

25 A.    Yes.

1 Q.   Okay.   And she knew that?

2 A.   Yes.

3 Q.   Okay.   And Troy would go to your grandmother's house with you?

4 A.   Unfortunately, yes.

5 Q.   And your grandmother saw you and Troy together?

6 A.   Yes.

7 Q.   And all those things that you did with Troy was by choice?

8 A.   Yes, it was.

9 Q.   And you agreed to do those things with Troy?

10 A.   Yes, I did.

11 Q.   Now, during this time, you weren't working, were you?

12 A.   No, I was in school.

13 Q.   Troy was working?

14 A.   Yes.

15 Q.   He had a job in the music industry or something?

16 A.   He was into computers -- mostly computers.   The music industry

17 was more like a hobby.   I guess some sound engineer.

18 Q.   But that's what I meant.

19 A.   Yeah.

20 Q.   Okay.   And you lived at Troy's house?

21 A.   Yes.

22 Q.   And you didn't pay rent?

23 A.   No.

24 Q.   And he provided your food, correct?

25 A.   Yes, he did.

1  Q.    And clothes?

2  A.    Yes, he did.

3  Q.    And expenses?

4  A.    Yes.

5  Q.    And during that time, at least initially, you loved Troy,

6  didn't you?

7  A.    Yes, I did.

8  Q.    And at some point, the relationship ended, correct?

9  A.    Yes.

10 Q.    And then, a couple months ago you received a call from the

11 government in this case, correct?

12 A.    Yes.

13 Q.    Asking you if you knew Troy?

14 A.    That is correct.

15 Q.    And asking you if you would be willing to testify in this case?

16 A.    Correct.

17 Q.    And that phone call brought back all those emotions, didn't it?

18 A.    Uh-huh -- yes, they did.

19 Q.    And now, you're here today, correct?

20 A.    Yes.

21        MR. PADILLA:  That's all I have, Judge.  Thank you.

22        THE COURT:  Redirect?

23 BY MS. MEDETIS:

24 Q.    Dean, just a few more questions.

25        Did you talk to Troy about your childhood?

```
 1   A.    Yes, I did.

 2   Q.    Did he know about your various experiences and your home life

 3   before you moved in with him?

 4   A.    Yes.

 5   Q.    And when did you talk to him about that?

 6   A.    I'm a talkative open person.  I would say the first day, you

 7   know, I was very open about myself and my childhood and the things

 8   that had gone on in my life.  And you know, it's kind of therapy to

 9   talk about it.  So he knew within a couple of days.

10   Q.    Defense counsel asked you if you were in a committed

11   relationship.  Do you remember that?

12   A.    Yes.

13   Q.    And you said, I wouldn't call it a committed relationship,

14   correct?

15   A.    Correct.

16   Q.    Why did you say that?

17   A.    I had found out that during that course of living with him that

18   he had a sexual --

19            MR. PADILLA:  Objection, Judge.

20            THE COURT:  Overruled.

21            THE WITNESS:  That he had a sexual encounter with another

22   boy.

23   BY MS. MEDETIS:

24   Q.    Okay.  And on cross-examination the defendant asked you if you

25   had gone to Troy's mother's house to various functions.
```

1        Do you remember that?

2   A.   Yes.

3   Q.   And you answered that, yes, you did go to family functions?

4   A.   Yes.

5   Q.   With Troy?

6        And you had met the defendant's mother, correct?

7   A.   Correct.

8   Q.   At those functions?

9   A.   Yes.

10  Q.   What was her name?

11  A.   Karen.

12  Q.   You had said, in response to defense counsel's questions, he

13  asked you did she know about your relationship and you responded

14  yes, she was pissed off.

15       Do you remember that?

16  A.   Yes, I do.

17  Q.   Why was she pissed off?

18       MR. PADILLA:  Objection, Judge.  Speculation as to what the

19  mother is thinking.

20       THE COURT:  If he knows.

21       THE WITNESS:  She could not believe that Troy was in a

22  relationship with me after he had just been in a relationship that

23  he had gotten in trouble with, with Mark.

24       MR. PADILLA:  Objection.

25       THE COURT:  Overruled.

1          THE WITNESS:  So she was shocked that he would engage in

2   another relationship with someone under the age of 18 when he wasn't

3   even supposed to be around anyone that was 18 at the time.  So she

4   was mad.  She was not happy about it.

5   BY MS. MEDETIS:

6   Q.   On cross-examination you had said that you and Troy went to

7   your grandmother's house, correct?

8   A.   Yes.

9   Q.   And is that where Troy met your 12-year-old cousin, Adam?

10  A.   Yes.

11  Q.   And you said on cross-examination that you had gone to your

12  grandmother's house together with Troy, correct?

13  A.   Yes.

14  Q.   But isn't it also true that Troy went back to your

15  grandmother's house alone?

16  A.   Yes, he did.

17          MR. PADILLA:  Objection, Judge.

18          THE COURT:  Overruled.

19          THE WITNESS:  Yes.

20  BY MS. MEDETIS:

21  Q.   And it was to see your 12-year-old cousin, right?

22  A.   Yes.

23          MR. PADILLA:  Judge, I just want to object again as to why

24  he knew the 12-year-old.

25          THE COURT:  Overruled.

1  BY MS. MEDETIS:

2  Q.   Let me repeat the question.

3       He went there to see your 12-year-old brother, correct?

4          MR. PADILLA:  Objection; leading, Judge.

5          THE COURT:  Overruled.

6  BY MS. MEDETIS:

7  Q.   Is that correct?

8  A.   He went there to see my 12-year-old cousin, Adam, without me.

9  I was at school.

10         MS. MEDETIS:  Okay.  Thank you.

11         THE COURT:  Thank you.  You may step down.

12         Call your next witness.

13         MS. MEDETIS:  Your Honor, the government rests at this

14 time.

15         THE COURT:  Okay.  Let me see counsel at sidebar.

16         Well, why don't we do this.  The jury can take a short

17 recess and then we'll get started again.

18         (Thereupon, the jury exited the courtroom.)

19         THE COURT:  Okay.  Do you want to make your motion?

20         MS. PHILLIPS-WILLIAMS:  Your Honor, pursuant to Rule 29

21 Federal Rules of Evidence, we move for a judgment of acquittal to

22 Counts One and Two.  I'm not going to make a lot of argument because

23 the government's case is not sufficient.

24         As to Count Three, I don't think the government's case is

25 sufficient and I don't think that the defendant was outside of the

1  country.  The obligation, it's a state or a United States

2  jurisdictional argument for him to register.  There is no way that

3  he could have registered while in the Dominican Republic.

4      So as to Count Three, I would ask the Court to grant a

5  judgment of acquittal.

6      THE COURT:  Viewing the evidence in the light most

7  favorable to the government, including all reasonable inferences and

8  credibility choices that can be drawn therefrom, I'll deny the

9  motion.

10     Okay.  Where are we on the defense case and what are you

11 going to do?

12     MR. PADILLA:  Judge, we're going to rest at this time.

13     THE COURT:  Okay.  Can we look at the jury instructions,

14 please.  Let's see.  If you have objections let me know.

15     It starts with members of the jury.  Page 2, the

16 government's burden of proof is heavy.

17     MS. PHILLIPS-WILLIAMS:  I don't think we have pages that

18 have numbers on it.

19     THE COURT:  Mine doesn't either.  So I'll just start with

20 the opening sentence of the instructions.  The second instruction is

21 the burden of proof.  The third instruction is, as I said before, a

22 description of the circumstantial evidence standard instruction.

23     The next instruction is when I say:  You must consider all

24 of the evidence.  That's a standard instruction.

25     The next instruction is:  Your decision must be based only

1  on the evidence presented here.

2          There's an alternate instruction.  Any preference as to

3  which one you want to use?

4          MS. PHILLIPS-WILLIAMS:  Your Honor, my next page doesn't

5  have that.  The problem is there's so many that I don't know which

6  one we're looking at.

7          THE COURT:  The alternate just has that phrase in there:

8          If the defendant chooses not to testify you cannot consider

9  that in any way.

10

11          MS. PHILLIPS-WILLIAMS:  We would ask for that.

12          THE COURT:  Okay.  So I'll take that one out and give that

13  one.

14          Let's see, the next instruction also there are three

15  variations of this one:  You should also ask yourself whether there

16  was evidence that the witness testified falsely.

17          And the second one:  The defendant has a right not to

18  testify.

19          The last portion -- the last paragraph in that:  The

20  evidence that the defendant was previously convicted of a crime is

21  not evidence of guilt of a crime in this trial.

22          The alternate has:  But you may use the evidence to decide

23  if you believe the defendant's testimony.

24          So that one wouldn't be appropriate so we'll just go with

25  the --

1

2          MS. PHILLIPS-WILLIAMS:  With the one before?

3          THE COURT:  Just the two-paragraph one.

4          MS. MEDETIS:  Yes, Your Honor, that would be basic

5   instruction 6.2.

6          THE COURT:  Okay.

7          MS. MEDETIS:  Of the Eleventh Circuit pattern instructions,

8   2010.

9          THE COURT:  Just the two-paragraph one.

10         The next one is the description of the indictment.

11         The next one is the description of the elements.  That's in

12  three pages -- four pages, right?

13         MS. MEDETIS:  Yes, Your Honor.

14         THE COURT:  The next instruction is the instruction that if

15  you object to -- that's the propensity instruction.

16         MS. MEDETIS:  Yes, Your Honor, we do object to that

17  strenuously.

18         MS. PHILLIPS-WILLIAMS:  Your Honor, I would.

19         MS. MEDETIS:  I would like to point out that there's a

20  typographical error the third line down it begins:  The defendant

21  has disposition of propensity to commit the offense.  It should be

22  offenses that are charged.  Offenses that are charged in the

23  superseding indictment.

24         THE COURT:  Okay.  I'll note those.  And I'll note the

25  defendant's objection overrule that objection based on the Eleventh

1  Circuit case that you provided yesterday.

2          The next instructions is on or about -- that's a standard

3  instruction.

4          The next instruction, separate crime.  That's a standard

5  instruction.

6          The next instruction is unanimous verdict.

7          The next instruction is selection of a foreperson and

8  that's it and then you have the verdict form.

9          MS. MEDETIS:  Your Honor, if I may, since the fingerprint

10 analyst was tendered as an expert, perhaps the Court would consider

11 a basic instruction regarding expert witnesses.

12         MS. PHILLIPS-WILLIAMS:  We don't have an objection to the

13 expert, Your Honor.

14         THE COURT:  Which one is that?

15         MS. MEDETIS:  Your Honor, that's the instruction number 7.

16 That's on Page 29 of the patterned jury instructions of 2010.

17         THE COURT:  Okay.

18         MS. MEDETIS:  Would you like to see my copy, Your Honor?

19         THE COURT:  Sure.  Expert witness number 7.

20         MS. MEDETIS:  Correct.

21         MS. PHILLIPS-WILLIAMS:  Your Honor, could we get a copy of

22 the 413 instruction?  I saw it yesterday, but the version I'm

23 looking at in the jury instruction doesn't have it.

24         THE COURT:  Okay.  Verdict form.

25         All right.  20 minutes a side.  Are you ready to get going?

1          Cut up your time the way you want to, but you will hear a

2  little seminar beep to indicate your 20 minutes is up.

3          Ready?

4          MS. MEDETIS:  Your Honor, just a moment.  If I could take

5  all the --

6

7          MS. PHILLIPS-WILLIAMS:  Your Honor, could we have a quick

8  break?

9          THE COURT:  Yes.

10          (Thereupon, a ten-minute recess was taken.)

11          MS. MEDETIS:  Could I get the most recent copy of the jury

12  instructions?

13          THE COURT:  They are pretty much what we agreed on.  So

14  other than the suggestion that you made to you're changing --

15          MS. MEDETIS:  Thank you, Judge.

16          THE COURT:  Okay, are we ready?

17          MS. MEDETIS:  Ready, Your Honor.

18          THE COURT:  Bring the jury in, please.

19          (Thereupon, the jury entered the courtroom.)

20          THE COURT:  Okay.  Have a seat everyone.

21          Ladies and gentlemen, you've heard all the evidence you're

22  going to hear in the case.  So we have concluded the presentation of

23  the evidence phase of the trial and we are now in the closing

24  argument phase.

25          Both parties have an opportunity to summarize and interpret

1  the evidence for you as they see it and to persuade you to their

2  respective points of view as to the case.

3       Both sides have the same amount of time, 20 minutes a side.

4  The government will go first.  It doesn't have to use all of its 20

5  minutes in the opening portion of its closing argument.

6       And then, you'll hear from the defense.  And then, if the

7  government has any time remaining, it can respond and use the

8  remainder of its time to respond to the defendant's closing

9  argument.  And as I said, both sides have the same amount of time

10 and when the 20 minutes is up, then that concludes their closing

11 arguments.

12      And then, I'll read to you the instructions as to what the

13 law is in the case as then you can begin your deliberations.

14      Okay.  Now, with that, we'll hear first from government

15 counsel.

16      MS. MEDETIS:  Good morning, ladies and gentlemen of the

17 jury.

18      THE JURORS:  Good morning.

19      MS. MEDETIS:  I told you at the beginning of this trial

20 that it is the government's job to prove the defendant is guilty of

21 the charges in the superseding indictment beyond a reasonable doubt.

22 It is our burden and only our burden.  The defendant has no burden

23 of proof in this case.  It is solely our job to prove his guilt

24 beyond a reasonable doubt and we embrace that burden.

25      And I submit to you, ladies and gentlemen, that based on

1  the testimony that you heard over the course of yesterday and today,

2  and based on the evidence that has been admitted in the government's

3  exhibits, you will find overwhelming evidence proving the defendant

4  guilty of all three crimes charged in the indictment.

5          Now, as the Judge will instruct you, the defendant has been

6  charged with three crimes.  Count One and Two charges the defendant,

7  a United States citizen, with traveling in foreign commerce, that is

8  from the United States to the Dominican Republic and while in the

9  Dominican Republic, engaging in illicit sexual activity with D.G.M.

10 in Count One and J.R.P. in Count Two.  You got to know them as

11 Dxxxxx in Count One and Jxxx in Count Two.

12         Count Three charges that the defendant was a registered sex

13 offender, that he was required to register under federal and state

14 law, California law, as a sex offender, a previously convicted sex

15 offender, and that while he was subject to those registration

16 requirements, he committed the felonies charged in Counts One and

17 Two.

18         So if you find the defendant guilty of Count One and Two

19 and you determine that the government has proved beyond a reasonable

20 doubt that he was also subject to the registration requirements of

21 the sex offender under federal law or other law, in this case

22 California law, then you can find him guilty of Count Two.

23         Now, let's talk about what you heard yesterday and today

24 and what the evidence was yesterday and today.  And let me be clear,

25 you are to rely on your recollection of the evidence, not what I

1    say, not what defense counsel says.  It's not what we say is in

2    evidence.  It's your recollection of the evidence.

3         The government has to show three things to prove Count One

4    and Two of the indictment.  And you will get this copy of the jury

5    instructions so you don't need to read them now, but these are the

6    exact copy of the jury instructions that you will get.

7         The government has to prove three things; first, that the

8    defendant was a U.S. citizen, second that he traveled in foreign

9    commerce, and third, that he engaged in illicit sexual activity when

10   he got to a foreign place.

11        Well, let's talk about what the government and the

12   defendant agree upon.  We agree, as per the stipulation, as to

13   Government's Exhibit One, we agree that the defendant is a United

14   States citizen.  We also agree that the defendant traveled in

15   foreign commerce when he flew from the United States to the

16   Dominican Republic.  So you don't need to think about those two

17   things.  Your only job in Counts One and Two is to determine if he

18   engaged in illicit sexual conduct with Dxxxxx and Jxxx between

19   October 2009 and May 4th, 2012.

20        Well, the jury instructions define illicit sexual conduct

21   for you.  And you will see, and the Court will instruct you, that

22   illicit sexual conduct means -- it can mean two things -- a sexual

23   act, as that term is defined, or commercial sex act.  And the

24   difference between those two is what's the age of the victim.

25   Illicit sexual conduct, the sexual act definition, is a sexual act

1 with any person under 16 years old that includes contact between the

2 penis and the vulva, or the penis and the anus, or conduct between

3 the mouth and the penis, or penetration however slight of another

4 person's anal or genital opening by the hand or finger of somebody

5 else.

6         Now, in this case, the evidence showed than Dxxxxx and Jxxx

7 are 13 years old and 15 years old, respectfully.  So your job is to

8 decide if a sexual act occurred.  If the defendant committed a

9 sexual act against those two children.

10        The commercial sex act definition of illicit sexual conduct

11 applies to a child that's under 18.  And a commercial sex act is

12 simply a sexual act in exchange for something of value; money.  I

13 submit in this case that the evidence shows that there was both

14 contact between the mouth and the penis, the defendant's mouth and

15 the penises of these young boys, and there was also a commercial sex

16 acts.  Remember when Jxxx testified, the defendant gave him 200

17 pesos sometimes so he wouldn't feel bad.

18        Let's talk a little more about the evidence in Counts One

19 and Two.  And remember you're only question is did an illicit sexual

20 act occur.  Did the defendant commit an illicit sexual conduct.

21        D.G.M. testified, as you will recall, that the defendant in

22 D.M.G.'s words -- in Dxxxxx's -- words sucked his penis, that

23 defendant sucked his penis the night before his arrest.  The

24 defendant was arrested on May 3rd.  The defendant sucked his penis,

25 and the child, Dxxxxx ejaculated in the defendant's mouth and the

1  defendant swallowed it.

2       You will recall Jxxx Axxxxxx's testimony.  You will recall

3  Jxxx Axxxxxx met the defendant and would go to his house so the

4  defendant could feed him.  The defendant would give him money.  And

5  what did the defendant do?  The defendant, in Jxxx Axxxxxx's words,

6  the defendant sucked Jxxx Axxxxxx's penis and then, he gave him

7  money, so he wouldn't feel bad 200 pesos, 200 Dominican pesos in a

8  poor country.  I submit to you that's not a lot of money.

9       And if that wasn't bad enough, if it wasn't bad enough that

10 the defendant sucked Jxxx Axxxxxx's penis, 15-year-old, and if it

11 wasn't bad enough that he gave him money to make him feel better

12 about it, and if it wasn't bad enough that he swallowed his semen,

13 the defendant added insult to injury and looked up at Jxxx Axxxxxx

14 and said to Axxxxxx, it tastes good.

15      Does that sound familiar to you, ladies and gentlemen, it

16 tastes good?  It should.  It's the same thing that the defendant

17 said to Dean Lumpkin when he would perform oral sex on Dean Lumpkin

18 a 17-year-old who, by all accounts, was in the same desperate

19 position that Dxxxxx and Jxxx are, poor shoeshine boys in the

20 Dominican Republic, working because they wanted to be able to go to

21 school.  Working because they want to be able to eat.

22      At 15 pesos a shoeshine, which is far less than the 200

23 pesos they could get from the defendant.  We're not talking U.S.

24 dollars here.  We're talking cents; nickels and dimes.  And Dean

25 Lumpkin came from an abusive home and Dean Lumpkin was homeless, by

1    all accounts.  And the defendant saw that and seized on that and he

2    took him in and he provided for him.  And he had sexual conduct with

3    him, the same sort of illicit sexual conduct that he performed on

4    Jxxx and Dxxxxx.

5         And the Judge will instruct you on the law.  The Judge will

6    instruct you that you can consider the testimony of Dean Lumpkin and

7    you can consider that testimony as the defendant's modus operandi,

8    as the defendant's habit, as the defendant's propensity to find

9    little boys and perform oral sex on them, perform sexual acts on

10   them.  You can find, or you can look at that evidence, and determine

11   did the defendant have a predisposition, a sexual desire for young

12   boys?  I submit from the evidence that you have to conclude yes.

13        Let's not forget the 1991 conviction for sodomizing an

14   18-year-old, somebody under 18.  The defendant was convicted of

15   that.  Let's not forget the 2001 conviction where the defendant was

16   convicted of lewd and lascivious conduct on somebody under 14.  And

17   let's not forget the conviction, the federal conviction, where the

18   defendant was convicted of trading child pornography.  Something

19   that you heard Dean testify about.  You even heard it in the

20   defendant's own words:  The world would be a better place if adults

21   could have sex with children.

22        And so the defendant decided that going to the Dominican

23   Republic would give him the best opportunity of doing that and he

24   did do that.  He did have illicit sexual conduct with Dxxxxx and

25   Jxxx.  You heard it from them and you know it based on his prior

1   convictions, and you know it from Dean Lumpkin's testimony.

2           It's not impossible.  It's not improbable, the law will

3   tell you that if he did it before he didn't do it again.  Of course,

4   he did it again because the world, according to the defendant, would

5   be a better place if adults would have sex with children.

6           And the defendant didn't like the U.S. laws.  The defendant

7   felt confined and hindered by the laws of the United States that,

8   rightly, prohibited adults from having sex with minors.  So he

9   needed the freedom to exercise his sexual desires for little boys

10  and he moved to the Dominican Republic.  He wanted to escape the

11  label of a registered sex offender.

12          And what about that?  What about Count Three of him being a

13  registered sex offender?  Look at Government's Exhibit 6-A through

14  16, the registration documents.  His requirement was a lifetime

15  requirement starting in 1991 and you will see the dates.  And why

16  was he a registered sex offender?  Because of that 2001 conviction

17  for lewd and lascivious conduct with somebody under 14.  And why was

18  he a registered sexual offender?  For sodomizing a child who was

19  under 18 years old back in 1991.

20          And we know it's the defendant who is required to register

21  because you heard the fingerprint analyst.  You saw that he had

22  compared fingerprints taken by the United States Marshal.  So

23  there's no argument there.  The defendant was required to register

24  as a sex offender.  And you will see from the jury instructions, the

25  Judge will advise you that his conviction, his federal conviction,

1  for the child pornography, that violation of 2252, that requires him

2  to register under federal law as a sex offender.

3        He was subject to register as a sex offender.  He was

4  required to do so under the law.  And what did he do?  He left to

5  the Dominican Republic to avoid it.  And you will see it in his

6  e-mails that he left to the Dominican Republic so that he could hang

7  out with cabana boys, little boys, with the little children like

8  Dxxxxx and Jxxx, those children who went back to him time, after

9  time, after time because he fed them and gave them money, but at

10 what cost to them?

11       The evidence is overwhelming.  Remember what those boys

12 said on this stand.  Look at the documents.  They don't lie.  It's

13 in black and white.  And you will conclude from those exhibits that

14 the defendant was subject, under federal law, to register as a sex

15 offender, that the defendant was required under California law to

16 register as a sex offender during the duration of his life,

17 including that point in time between October 20, 2009 and May of

18 2012 as charged in the indictment.  And he thought that by going to

19 the Dominican Republic he was free and clear.

20       It's up to you ladies and gentlemen to show him that he is

21 not free and clear.  That he is guilty of committing illicit sexual

22 conduct in Count One and Count Two with Dxxxxx and Jxxx.  And that

23 he committed those two crimes while all the while subject to

24 register as a sex offender.

25       You have to conclude, based on that evidence, that he is

1  guilty beyond a reasonable doubt.  There is no other reasonable

2  conclusion.

3         Thank you.

4         MR. PADILLA:  Troy Brimm is innocent of the charge in this

5  case.  He is innocent and we know that because of the testimony of

6  the alleged victims in this case.

7         Based on the testimony provided by those two teenagers

8  yesterday, their version of the events cannot be believed.  Not only

9  did they change their stories from day-to-day, but they changed

10  their stories while on the stand.  The government would ask them a

11  question and I would come along and I would ask a question and the

12  story would change.  Their version of the events cannot be believed

13  and because of that, Troy must be found innocent.

14         Now, the Dominican Republic is an island nation.  The other

15  half of the island is made up of Haiti.  The year round temperature

16  in the Dominican Republic is 77 degrees.  It's got the highest point

17  of the Caribbean and the lowest point of the Caribbean and miles of

18  beaches.

19         MS. MEDETIS:  Judge, those facts are not in evidence.

20         THE COURT:  Overruled.

21         MR. PADILLA:  And that is the place that Troy moved to in

22  1999 and he stayed in the Dominican Republic from 2009 until his

23  arrest in this case, but this case really isn't about the Dominican.

24         This case really isn't about Troy.  This case is about

25  self-preservation.  This case is about the testimony of those two

1  teenage boys.  So that when Dxxxxx's father arrives at Troy's house

2  and the police arrive at Troy's house with a camera crew, rather

3  than say that nothing happened that night, they make up a story.

4        And they make up that story because Troy is an American and

5  he is gay.  And because when Dxxxxx's father gets there he is upset,

6  he is angry, and he is yelling.  And so these two teenage boys

7  spewed this story out to the people who were there.  And they do

8  that because they couldn't tell their parents that they would rather

9  stay with Troy than go home because they couldn't tell their parents

10  that they were staying with a gay gringo.  So they said what the

11  police wanted them to say, what they had to say.

12        Now, this is a serious case.  There are serious allegations

13  in this case.  And not only is it serious because of the allegations

14  in this case, this is a serious case because the government in this

15  case is prosecuting Troy who was living in the Dominican Republic

16  for three years.  Not being prosecuted in the Dominican Republic,

17  they have brought Mr. Brimm to the United States to prosecute him

18  here and they brought all the witnesses from the Dominican Republic

19  to testify in this case.  It's serious.

20        And you would expect a serious case and you would expect in

21  a case like this, you would expect that the stories of the victims

22  in this case, the stories of these two teenage boys, you would

23  expect that the stories would make sense.  You would expect that the

24  stories would be the same.  I'm not talking about the minor details.

25  I'm not talking about every minor detail in the case, but I'm

1  talking about the significant details.  The details that matter.

2  The details that determine whether Mr. Brimm is guilty or innocent.

3        So let's talk about some of those things that came out

4  yesterday and let's start with something easy.  Let's start with

5  something as easy as how did Jxxx and Dxxxxx get to Troy's house the

6  night before he was arrested?

7        So Dxxxxx testifies that he's at the Kahuna, that Troy is

8  sitting in the restaurant eating and that Jxxx comes by and tells

9  Dxxxxx let's go to Troy's house and they walked to Troy's house.

10 Jxxx testifies and Jxxx says I was over at a friend's house.  I

11 decided to go to Troy's house, but before I went there I went to go

12 pick up Jxxx who was at the Kahuna.  No mention of Troy.

13        They decided to go to Troy's house uninvited.  They didn't

14 call ahead of time.  So Jxxx and Dxxxxx go to Troy's house.  And

15 Jxxx said when he got to Troy's apartment and knocked on the door,

16 there was Troy.  So despite the fact that the government, in this

17 case, that they're steering in this case is that Troy lured these

18 boys there with promises of food and money.

19        That's not what Jxxx says.  That's not what he says at all.

20 His version of the events contradicts the government's theory of

21 their own case.  He wasn't lured there.  He decided to go on his own

22 and shows up at Troy's house without calling and knocks on his door

23 and Troy is inside.

24        What about the testimony about the casino house?  Dxxxxx

25 testifies that he had been there two times.  Jxxx testifies that no,

1  no, no, no, we had been there together many, many times, many times

2  together.

3      And what about the description of that casino house?

4  Dxxxxx testified that when he was at the front door looking into

5  that apartment he saw two bedrooms on either side and straight ahead

6  was the bathroom.

7      And then Jxxx testifies and, initially, he said that he had

8  been to that house about two years ago when he met Troy for the

9  first time.  And that during over the course of the two years that

10 he had been there about every week.  Now, it gets a little confusing

11 because when I asked him some questions about that, he says two

12 years.  And then he says, oh, maybe one year.  And then he finally

13 says, you know what, I don't really remember.  And he's saying that

14 because I'm asking him to describe what the house looked like.  If

15 you're standing at the front door and you look inside, what do you

16 see?

17      And what did he say?  There was had a bedroom on the

18 right-hand side.  One bedroom.  What about the bathroom?  In a place

19 that you testified that you had been in nearly every single week for

20 two years:  I don't remember where the bathroom was.  He can't

21 remember.

22      These are details that you would expect these two boys to

23 know cold in a case like this.  In a case where they're alleging

24 that they had been to Troy's house many times, you would expect

25 that.

1        You wouldn't expect there to be direct conflict in the

2   evidence from these two boys, right?  When these two teenagers

3   testified you would think -- especially the night when he was

4   arrested -- that just happened, that was May 3rd of this year.  That

5   wasn't a year ago and was not two years ago, but not only was it

6   recent, but think about what happened in this case.  Think about

7   that here these two teenagers are in the Dominican Republic with an

8   American, with a camera crew, and the U.S. Government gets involved.

9   This is a significant event for everybody involved.  An event that

10  you would expect them to remember.

11       So what did they say about that night at Troy's house?  And

12  remember, that night, that's the only time that Dxxxxx testified

13  that something happened to him with Troy.  That's the only event

14  with Dxxxxx.  And he testified that he is at Troy's house watching

15  TV and at some point, he goes into the bedroom with Troy.  That's

16  the only instance where Dxxxxx says anything like that.

17       And Jxxx testified and Jxxx said, yes, we were there in the

18  room and we ate and I was on the couch.  Dxxxxx was on the couch.

19  We were watching TV and at some point I got tired.  He goes into the

20  bedroom and sleeps in one of the two beds in that bedroom.  And he

21  testified that Troy was in the other bed and he took the other bed

22  and went to sleep.

23       When he did that Dxxxxx was out on the couch watching TV.

24  When he woke up the next morning, he finds Dxxxxx exactly where he

25  left them the night before.  So what does that mean?  If that's the

1 only time that Dxxxxx says I went to the bedroom with Troy.  And

2 Jxxx, who's there, never sees that and he goes into the bedroom and

3 sleeps with Troy in the separate bed.

4          Now, remember, the government's theory in this case is that

5 Troy has lured these two teenage boys to his place to molest them,

6 but Jxxx testified that nothing happen to them.  As a matter of

7 fact, Troy was so concerned that he asked both of them, you know

8 what, call your parents.  Make sure to call your parents so they

9 know where you are and so they're not worried about you.

10          Remember, the government's theory isn't that Troy has lured

11 these two teenagers to his house for the purpose of molesting them.

12 It doesn't make any sense.  It doesn't make any sense at all that if

13 that's what the plan is that he then tells them, call your parents

14 so they know where you are.

15          Now, not only do I want you to remember what the testimony

16 was, but I also want you to remember how they appeared when they

17 testified.  I want you to compare how they testified with the

18 government when there was a question and there was an answer.  There

19 was a question and there was an answer.  Probably what you would

20 expect after having met with them for two days, right?  I'm going to

21 ask you a question and then you're going to answer.  There was no

22 looking around the room.  There were no delays; question, answer.

23          Now, when I asked the questions that's not what happened.

24 I would ask them a question.  They would be looking around.  They

25 would be looking at the government.  They would be looking up at the

1  air.  And then, there were those pauses, long, long, comfortable

2  pauses.

3          I wasn't asking them about another case.  I'm asking them

4  about this case.  I'm asking them about the facts in this case.

5  Things that you would expect that they would know the answers to.

6  Instead, we get a long pause.  We get a lot of looking around.  So

7  remember the contrast between the government's questions and their

8  answers and my questions.

9          And the result of all that, the result of all the questions

10 and the inconsistencies and the contradictory statements, is that

11 something is not right here.  Something doesn't fit.  Not only that,

12 but who are you going to believe?  Who do you believe in this case?

13 Do you believe Jxxx?  Because if you believe Jxxx, then nothing

14 happened to Dxxxxx.  Do you believe Dxxxxx?

15         How do you weigh each of their testimony?  Who is the more

16 truthful than the other?  The problem with that is that you have two

17 different versions of the events.  And because of that, the

18 government hasn't proven their case.  They haven't proven their case

19 beyond a reasonable doubt.

20         The other thing that doesn't figure, the other thing that's

21 strange in this case, and the other thing that I want you to think

22 about is what happened just a couple of hours after Troy was

23 arrested in this case.  Just a couple of hours after the police

24 arrived at his apartment with Dxxxxx's father, with a camera crew,

25 within hours of that Dxxxxx testified when he is at a police station

1   and he sees outside his father talking to his lawyer.  This is not

2   after the investigation.  This is not days later.  This is a lawyer

3   where Dxxxxx's father at the police station within an hour or so,

4   within two hours of the police arriving.  Something doesn't fit

5   here.  Something is not right here.

6          Now, Troy has a prior record.  We know that.  We're going

7   to see it.  It's there.  We're not minimizing it.  It is what it is,

8   but that doesn't prove that Troy is guilty in this case.  Those

9   priors don't prove that Troy committed the alleged acts in this

10  case.

11         Let me just talk very quickly about the government's last

12  witness, Mr. Lumpkin and I want you to think about the timing of

13  that witness.

14         THE COURT:  Time is up.

15         MR. PADILLA:  Just give me a minute, Judge, and I'll wrap

16  it up.

17         I want you to think about the time of them bringing in Dean

18  Lumpkin in this case.  After the victims have testified and after

19  the contrary statements made by these two teenage boys, who do they

20  bring in?  Dean Lumpkin on a case that is nearly 20 years old.  On a

21  case where this was a consensual relationship that ended and all of

22  a sudden he gets a call, almost 20 years later, and sure I'll be

23  there.

24         I just want to make two more points.  And all this idea on

25  this theory that the government has presented that Troy is this bad

1   person.  He was living in the Dominican Republic for two years.  Was

2   there any evidence whatsoever that there was any child pornography

3   when he was arrested in this case?  Was there any evidence that

4   these two teenage boys watched pornography with Troy?  No videos, no

5   photographs, no chat room stuff, nothing whatsoever.  None of that

6   evidence.  Yet, the government is pointing Troy out to be some

7   monster, some sort of predator, and they didn't find anything like

8   that in this case.

9        The last thing I want to mention very quickly is Count

10  Three and I just want you to use your common sense on that last

11  count.  Troy was required to register in California.  He had been

12  living in the Dominican Republic, which is not California, for three

13  years.  Not one person from the Dominican Republic testified in this

14  case that Troy was required to register in the Dominican Republic.

15  Use your common sense.  If he's required to register in California

16  and he moves to Nevada, like I asked the agent, and he moved to

17  Nevada does it make any sense that he is required to register in

18  California even though he's in Nevada?  The agent did not know.  The

19  government's agent said I don't know about that.

20       Use your common sense if you drive in the State of Florida

21  you are required to have a license, correct?  But if you move to

22  Georgia, are you required to have a Florida's driver's license to

23  drive, or are you required to have a Georgia driver's license to

24  drive?

25       He was not required to register in the Dominican Republic

1   because he was living there because that's not California.  He was

2   domiciled, he was living, in the Dominican.

3          At the end, like it was from the opening statement from

4   yesterday morning, this case is about self-preservation and about

5   conflicting statements and about insufficient evidence.  It's about

6   the government not proving their case against Troy and it's about

7   finding Troy not guilty in this case.

8          Thank you.

9          MS. MEDETIS:  Ladies and gentlemen, let us remind ourselves

10  who the victims are in this case.  There is a 15-year-old boy who is

11  still in the fourth grade and a 13-year-old boy.

12          They're not your average American teenager.  They're poor

13  and their destitute and they work for pennies and dimes and nickels

14  to gather enough food to eat.  Consider that on the witness stand

15  for more than an hour their attention span is limited.  Consider

16  that when you consider the credibility of the testimony.

17          Consider that if the victims made up a story, why would

18  they pick the most embarrassing and humiliating thing that could

19  happen to a young boy and pick that as their accusation and pick

20  that as their story?

21          Why would they make that up?  Of all the things that they

22  could say about the defendant, why would they pick that?

23          Defense counsel is asking you to believe they picked that

24  because back in May of 2012 they anticipated that they would be

25  testifying in court in the United States.  Does that make sense?

1           And the description of the apartment where they were

2    molested, where they were violated, where they were traumatized,

3    that's the detail that defense counsel is hinging on?

4           Are they asking that the victim should have had a notebook

5    and jotted down in chronological order every instance of abuse and

6    every detail because years and months ago when Jxxx Axxxxxx was

7    sexually abused by the defendant he anticipated that he would be

8    here testifying in a foreign country about the defendant's sexual

9    abuse and the defendant's proclivities to violate children?

10          The defendant and defense counsel could refer to these

11   victims as teenagers all they want, but you saw them.  They are

12   children.  Even teenagers, by our own American standards, they are

13   children.  And what is not right about this case is that the

14   defendant preys on children and has sex with children.

15          And what isn't right about this case is that he did it to

16   kids in need.  He did it to Dean Lumpkin when he was homeless and he

17   did it to these boys when they were poor, these shoeshine boys.

18          And let's be clear, the government's case is not that he

19   lured them or that he forced them, even though you will see from the

20   law that force or luring is not an element of the offense.  We don't

21   have to prove that.  He didn't do it like that.

22          He didn't trick these kids.  He made it very clear, I have

23   something that you need.  I have something that you want.  I have

24   money for you.  I have food for you.  And the defense counsel is

25   right.  They did it for survival.  Jxxx and Dxxxxx went back to the

1  defendant because they needed money to eat or they needed food to

2  eat not because it doesn't make sense.  It makes perfect sense that

3  he was their cash cow and what other choice did they have?  Consider

4  that.

5          And think of the fact that when Jxxx Axxxxxx testified that

6  after the defendant swallowed his semen and after the defendant

7  performed oral sex on Jxxx Axxxxxx and swallowed his semen and

8  looked up at him and said that's good.  Do you think two boys from

9  the Dominican Republic knew Dean Lumpkin and knew that Dean Lumpkin

10 would come in here and say the same thing, or do you think that's

11 because that's the defendant's modus operandi, and that the more

12 things change, the more things stay the same.

13         The defendant wasn't concerned about the boys when he asked

14 them to call home.  The defendant was concerned about himself that

15 he would not be caught.  He wanted those kids to get out of his

16 house because he didn't want to get caught.  But do you know what?

17 He got caught.  He got caught.

18         And it's not about the gay gringo, to quote defense

19 counsel.  This case is not about a gay gringo.  This case is about a

20 U.S. citizen.  A U.S. citizen who thought he would leave this

21 country and escape U.S. law.  That is an offense to this country.

22 That is an offense to any American citizen because the United States

23 of America does not tolerate that behavior.  We do not tolerate it

24 in our own borders.

25         We do not tolerate adults having sex with children in our

1  own borders and we certainly do not tolerate it when Americans try

2  to go to a foreign country and do it because it is an embarrassment

3  and an affront.   And you should be offended that defense counsel

4  should insult your intelligence by suggesting that the kids made

5  this up because this is a gay American gringo.

6         Ladies and gentlemen, there is no conclusion to be drawn

7  other than this defendant is guilty beyond a reasonable doubt.   That

8  is what the evidence has shown and to the extent defense counsel has

9  asked you what makes sense?   Do these stories make sense?   Of course

10 they did do.   The only thing that does not make sense is this man's

11 crimes.   This man's desire to have sex with children because in his

12 words, the world would be a better place if adults could have sex

13 with children.   That's what does not makes sense.

14        And you know what does not make sense?   Remember, you are

15 dealing with the defendant that wanted to call Dean Lumpkin's

16 grandmother and ask for permission to have sex with Dean Lumpkin's

17 12-year-old cousin.   That does not make sense.   Do you know why?

18 Because it's a crime.

19        You will have to find on this evidence when you have gone

20 back to deliberate that the defendant is guilty beyond a reasonable

21 doubt of all these crimes, including Count Three, because if you

22 were to accept defense counsel's interpretation of Count Three

23 because he wasn't in California he wasn't subject to be sex offender

24 and that he wasn't subject to register as a sex offender.   If you

25 accept that interpretation that means that the defendant could move

1 to Nevada and commit crimes against minors and not get in trouble

2 for it.  That does not make sense.

3           Thank you.

4           THE COURT:  Members of the jury, it is now my duty to

5 instruct you on the rules of law that you must use in deciding this

6 case and after I've completed those instructions you will go to the

7 jury room and begin your discussions, what we call your

8 deliberations.

9           You must decide whether the government has proved its

10 specific facts necessary to find the defendant guilty beyond a

11 reasonable doubt.

12           The government's burden of proof is heavy, but it doesn't

13 have to prove the defendant's guilt beyond all possible doubt.  The

14 government's proof only has to exclude a reasonable doubt concerning

15 a defendant's guilt.

16           A reasonable doubt is a real doubt based upon your reason

17 and common sense after you have carefully and impartially considered

18 all the evidence in the case.

19           Proof beyond a reasonable doubt is proof so convincing that

20 you would be willing to rely and act on it without hesitation in the

21 most important of your own affairs.  If you are convinced that the

22 defendant has been proven guilty beyond a reasonable doubt, say so.

23 If you are not convinced, say so.

24           As I said before, you should consider all the evidence that

25 I have admitted in the case.  Evidence includes the testimony of the

1  witnesses and the exhibits admitted, but anything the lawyers say is

2  not evidence and is not binding upon you.

3       You should not assume from anything that I have said that I

4  have any opinion about any factual issue in this case.  Except for

5  my instructions to you on the law, you should disregard anything I

6  may have said during the trial in arriving at your own decision

7  about the facts.  Your own recollection and interpretation of the

8  evidence is what matters.

9       In considering the evidence you may use reason and common

10  sense to make your deductions to reach conclusions.  You should not

11  be concerned about whether the evidence is direct or circumstantial.

12       Direct evidence is the testimony of a person who asserts

13  that he or she has actual knowledge of a fact, such as an

14  eyewitness.

15       Circumstantial evidence is proof of a chain of facts and

16  circumstances that tend to prove or disprove a fact.  There is no

17  legal difference in the weight you may give to either direct or

18  circumstantial evidence.

19       When I say you must consider all the evidence, I do not

20  mean that you must accept all the evidence as true or accurate.  You

21  should decide whether you believe what each witness had to say and

22  how important that testimony was.  In making that decision, you may

23  believe or disbelieve any witness in whole or in part.  The numbers

24  of witness testifying concerning a particular point does not

25  necessarily matter.

1          In deciding whether you believe any witness, I suggest that

2     you ask yourselves a few questions:

3          Did the witness impress you as one who is telling the

4     truth?

5          Did the witness have a personal interest in the outcome of

6     the case?

7          Did the witness have the opportunity and ability to

8     accurately observe the things he or she testified about?

9          Did the witness appear to understand questions clearly and

10    answer them directly?

11         Did the witness' testimony differ from other testimony or

12    other evidence?

13         Your decision must be based only on the evidence presented

14    during the trial.  You must not be influenced in any way by either

15    sympathy for or prejudice against the defendant or the government.

16         You must follow the laws as I have explained it even if you

17    do not agree with the law.  You must follow all my instructions as a

18    whole and you must not single out and disregard any of the Court's

19    instructions on the law.

20         The indictment or formal charge against a defendant is not

21    evidence of guilt.  The law presumes every defendant is innocent.

22    The defendant does not have to proof his innocence or to produce any

23    evidence at all.

24         The defendant does not have to testify and if the defendant

25    chooses not to testify, you cannot consider that in any way while

1 making your decision.  The government must prove guilt beyond a

2 reasonable doubt and if it fails to do so, you must find the

3 defendant not guilty.

4         You should also ask yourselves whether there was evidence

5 that a witness testified falsely about an important fact and ask

6 whether there was evidence that at some other time the witness said

7 or did something, or didn't say or do something, that is different

8 from the testimony the witness gave during the trial.

9         Keep in mind that a simple mistake does not mean that a

10 witness was not telling the truth as he or she remembers it.  People

11 naturally tend to forget some things or remember them inaccurately.

12 So if a witness misstated something, you must decide whether it was

13 because of an innocent lapse in memory or an intentional deception.

14 The significance of your decision may depend upon whether the

15 misstatement was about an important fact or about an unimportant

16 detail.

17         The superseding indictment charges the defendant, Troy

18 Douglas Brimm, with three separate crimes called counts.  Each count

19 has a number.  You will be given a copy of the superseding

20 indictment to refer to during your deliberations.

21         Count One charges the defendant, a United States citizen,

22 with traveling in foreign commerce from the United States to the

23 Dominican Republic and engaging in illicit sexual conduct with a

24 minor D.G.M.

25         Count Two charges the defendant, a United States citizen,

1  with traveling in foreign commerce from the United States to the

2  Dominican Republic and engaging in illicit sexual conduct with a

3  minor J.R.P.

4      Count Three charges the defendant with committing a felony

5  offense involving a minor, as charged in Counts One and Two, while

6  being required to register as a sex offender.

7      As I just explained, Counts One and Two of the superseding

8  indictment charges the defendant with traveling in foreign commerce

9  and engaging in illicit sexual conduct with minors D.G.M. and J.R.P.

10      It is a federal crime for a United States citizen to travel

11  in foreign commerce and engage in any illicit sexual conduct with

12  another person.

13      The defendant can be found guilty of this crime only if all

14  the following facts are proved beyond a reasonable doubt:

15      One, the defendant is a United States citizen;

16      Two, the defendant traveled in foreign commerce;

17      And three, while the defendant was in the foreign place, he

18  engaged in illicit sexual conduct with another person, that is,

19  D.G.M. as to Count One and/or J.R.P., as to Count Two.

20      To travel in foreign commerce means that the defendant

21  moved from a place within the United States to a place outside the

22  United States.

23      For purposes of this offense, the term illicit sexual

24  conduct means a sexual act with a person under 16 years of age and

25  at least four years younger than the defendant.  The term illicit

1  sexual conduct also means a commercial sex act with a person under

2  18 years of age.

3          The term sexual act means:

4          Contact between the penis and the vulva, or the penis and

5  the anus, involving penetration however slight;

6          Contact between the mouth and the penis, or the mouth and

7  the vulva, or the mouth and the anus the penetration, however

8  slight, of another person's anus or genital opening by a hand,

9  finger, or any object with an intent to abuse, humiliate, harass, or

10 degrade the person, or to arouse or gratify the sexual desire of the

11 defendant or any other person;

12         Or an intentional touching of the -- not through the

13 clothing -- of the genitalia of a person younger than 16 years old

14 with the intent to abuse, humiliate, harass, or degrade the person,

15 or arouse or gratify the sexual desire of the defendant or any other

16 person.

17         Commercial sex act means any sex act for which anything of

18 value is given to or received by a person.

19         It is not necessary for the government to prove that the

20 illicit sexual conduct violated the laws of the foreign country

21 where it occurred or that the defendant intended to engage in the

22 illicit sexual conduct at the time he departed the United States.

23         Count Three of the superseding indictment charges the

24 defendant with committing an enumerated felony offense involving a

25 minor while being required to register as a sex offender under

1  federal or other law.

2        A defendant can be found guilty of this crime only if all

3  the following facts are proved beyond a reasonable doubt:

4        First, the defendant committed a felony offense involving a

5  minor;

6        And two, at the time the defendant committed the felony

7  offense involving minor, the defendant was required by federal or

8  other law to register as a sex offender.

9        You are instructed that a violation of Title 18, United

10 States Code, Section 2423(c) as charged in Counts One and Two of the

11 superseding indictment, is an enumerated felony violation involving

12 a minor.  A minor means any person under the age of 18 years.

13       You are also instructed that federal law requires a person

14 to register as a sex offender if the person is convicted of a sex

15 offense.

16       A violation of Title 18, United States Code, Section

17 2252(a)(2), that is receiving or distributing material involving the

18 sexual exploitation of minors, is a sex offense.  If a person is

19 convicted of that offense, that person is required to register as a

20 sex offender under federal law.

21       You are further instructed that California law requires a

22 person to register as a sex offender for the rest of his life if the

23 person is convicted of any of the following offenses as defined in

24 the California Penal Code:

25       Participating in an act of sodomy with another person who

1  is under 18 years of age in violation of California Penal Code,

2  Section 286(b)(1);

3          Committing a lewd and lascivious act upon or with the body,

4  or any part or member thereof, of a child who is under the age of 14

5  in violation of California Penal Code, Section 288(a).

6          You are instructed that evidence of conduct by the

7  defendant on a previous occasion has been offered by the government

8  for its bearing on any matter which is relevant, including the

9  defendant's disposition or propensity to commit the offenses that

10 are charged in the superseding indictment and the improbability that

11 the defendant has been falsely or mistakenly accused of these

12 crimes.

13         It is entirely up to the jury to determine what weight, in

14 any, such other conduct evidence deserves.  In reaching your

15 conclusion, you may consider all of the surrounding facts and

16 circumstances of such testimony and give it such weight as you think

17 it is entitled to receive in light of your experience and knowledge

18 in human affairs.

19         However, you are cautioned that the defendant is not on

20 trial here for any acts or crimes not alleged in the superseding

21 indictment.  The defendant may not be convicted of the crimes

22 charged in the superseding indictment if you were to find only that

23 he committed other crimes at some other time.  You are reminded that

24 at all times the government bears the burden of proving beyond a

25 reasonable doubt that the defendant committed the offense charged in

1  the superseding indictment.

2      When scientific, technical, or specialized knowledge might

3  be helpful, a person with special training or experience in that

4  field is allowed to state an opinion about the matter, but that does

5  not mean you must accept the witness' opinion.  As with other any

6  other witness' testimony, you must decide for yourself whether to

7  rely upon that opinion.

8      Each count of the superseding indictment charges a separate

9  crime and you must consider each crime and the evidence relating to

10 it separately.  If you find the defendant guilty or not guilty of

11 one crime that must not effect your verdict for any other crime.

12     I caution you that the defendant is on trial only for the

13 specific crimes charged in the superseding indictment.  You are here

14 to determine from the evidence in this case whether the defendant is

15 guilty or not guilty of those specific crimes.

16     You must never consider punishment in any way to decide

17 whether the defendant is guilty.  If you find the defendant is

18 guilty, the punishment is for the Judge along to decide later.

19     Your verdict, whether guilty or not guilty, must be

20 unanimous.  In other words, you must all agree.  Your deliberations

21 are secret and you will never have to explain your verdict to

22 anyone.

23     Each of you must decide the case for yourself and only

24 after fully considering the evidence with the other jurors.  So you

25 must discuss the case with one another and try to reach an

1  agreement.

2        While you are discussing the case, do not hesitate to

3  re-examine your own opinion and change your mind if you become

4  convinced that you were wrong, but do not give up your honest

5  beliefs just because others think differently, or because you simply

6  want to get the case over with.

7        Remember that in a very real way you are judges, judges of

8  the facts.  Your only interest is to seek the truth from the

9  evidence in the case.

10        When you go to the jury room, choose one of your members to

11  act as your foreperson.  The foreperson will preside over your

12  deliberations and will speak for you here in court.

13        A form of verdict has been prepared for your convenience.

14  Take the verdict form with you to the jury room and when you have

15  all agreed on the verdict, your foreperson must fill in the form,

16  sign and date it, and carry it back and return it to the courtroom.

17        If you wish to communicate with me at any time, please

18  write down your message or question and give it to the marshal.  The

19  marshal will bring it to me and I will respond as promptly as

20  possible, either in writing or by talking to you in the courtroom,

21  but I caution you not to tell me your numerical division of how many

22  jurors have voted one way or the other at that time.

23        This is the verdict form.  It has United States of America

24  versus Troy Douglas Brimm, defendant.  The verdict, we the jury in

25  the above-captioned case, unanimously finds as follows:

1        As to Count One of the superseding indictment, if you find

2   the defendant, Troy Douglas Brimm -- with the word guilty with a

3   line next to it.  Then, below that, you will find the words not

4   guilty with a line next to it.  Have your foreperson put an X or a

5   check, according to what your verdict is, on the line and go to the

6   next count and follow the count.  And then, please have your

7   foreperson date and sign it on the back.

8        And I will send back the verdict form along with the

9   instructions that I have just read to you, along with a copy of the

10  superseding indictment.  We will gather the evidence that was

11  admitted and send that back as well.

12       And I would ask Mr. Hoo and Miss Cathers, if the two of you

13  would remain behind.  The other 12 jurors can retire to begin your

14  deliberations.

15       (Thereupon, the jurors entered the jury room.)

16       THE COURT:  Folks, you were chosen as alternate jurors

17  during the course of the trial.  Experience teaches us that from

18  time to time we lose jurors, for one reason or another, and we

19  select alternates in that eventuality.  If that did occur in this

20  trial -- as relatively a short trial time wise anyway -- by law

21  we're only allowed to have 12 jurors deliberate.

22       I would ask that you not discuss the case or talk to anyone

23  about the case until after the jury has returned a verdict in the

24  event that for some reason if some juror were to become sick or

25  whatever, we would call upon you and ask you to come back and

1  participate in the jury deliberations.

2        You are welcome to call chambers and find out what the

3  verdict is and we will let you know if you're interested, but I do

4  hope that you have found your jury service to be an interesting and

5  educational experience.

6        We do very much appreciate your willingness to serve as

7  jurors.  I will ask that you continue to call for the two-week

8  period as you have been summoned for jury duty and you will get

9  instructions as to when or whether you will be needed back, but that

10 concludes your jury service for now and with our thanks you are free

11 to go.  Thank you.

12       Do you have anything in here?  Okay.  Robin, can you escort

13 them out the back.

14       And if you can get with the courtroom deputy and get those

15 exhibits together and we will send them back with the jury.

16       MS. PHILLIPS-WILLIAMS:  Your Honor --

17       THE COURT:  Yes.

18       MS. PHILLIPS-WILLIAMS:  I just want to renew all previous

19 motions.  I don't think I did that before.

20       THE COURT:  I don't think you did, but it crossed my mind

21 as well, but the same ruling denying the motion for acquittal at the

22 close of all the evidence.

23       MS. PHILLIPS-WILLIAMS:  And the dismissal as of 404(b).

24       THE COURT:  Yes, denied.  Okay.

25 (Recess.)

1          THE COURT:  I see that we have a note from the jury.

2          Question one:  Does the lifetime registration require

3 registration if in a foreign country?

4          Question number two:  Would the act or law that allows

5 someone to be prosecuted due to acts in foreign country also say

6 that a registered predator must register in that place of domicile?

7          Question number three:  The following clause "If I have no

8 residence address I must register in the jurisdiction where I am

9 physically present as a transient within five (5) working days of

10 becoming a transient."

11         And on the reverse side of the note:

12         3(a), please define jurisdiction as it applies to this

13 cause;

14         (b)  Please define transient as it refers to this clause.

15         Signed by Michael Blasberg.

16         Defense, does anybody have any comments?

17         MS. MEDETIS:  Your Honor, the government would request that

18 the Court just instruct the jury to rely on its recollection of the

19 evidence and on the four corners of the jury instructions for

20 guidance on what the law is.

21         And if it's not reflected in the jury instructions it's not

22 for your consideration because they're asking legal questions here.

23         THE COURT:  Anything from the defense?

24         MR. PADILLA:  Judge, I agree.  I think they should rely on

25 the instructions provided to them.

```
 1          THE COURT:  As to all three questions?

 2          MS. MEDETIS:  Yes, Your Honor, as far as the government is

 3  concerned.

 4          MS. MEDETIS:  Judge, the government would ask for the

 5  additional instruction to the jury that the law is defined in the

 6  jury instructions and that is the law that they are required to

 7  follow.  And what they are asking here are legal questions that are

 8  outside their consideration.

 9          THE COURT:  Dear Jurors, in answer to your note, you should

10  base your verdict on the evidence that has been presented and the

11  Court's instructions on the law that have been previously provided

12  to you.

13          Yes, no?

14          MR. PADILLA:  Yes, Judge.

15          MS. MEDETIS:  Yes, Judge.

16          THE COURT:  Robin, someone put on here Court's Exhibit

17  Number 6-D.

18          MS. MEDETIS:  Your Honor, I believe that's because they are

19  referring to when they quoted the clause.

20          In question number three, I believe they were referring to

21  Government's Exhibit 6-D.  That's what that quote is from, I'm

22  guessing.

23          THE COURT:  So I'm going to -- no, I'm not going to cross

24  it out.  It will be what it is, but we'll make this their note.

25  Court's number one and we'll make this Court's number two.  And it
```

1  is 12:52 p.m.

2          Anything else?

3          MS. MEDETIS:  Not from the government, Your Honor.

4          MR. PADILLA:  No, Judge.

5          THE COURT:  Okay.  We'll be in recess.

6  (Recess.)

7          THE COURT:  The jury has a verdict.  So I don't know if the

8  answer to the question was helpful or useless.

9          Please bring the jury in.

10          (Thereupon, the jury entered the courtroom.)

11          THE COURT:  Good afternoon, ladies and gentlemen.  Please

12  be seated.

13          I received a note from you that you have reached a verdict.

14  So at this time, I would ask that you hand up your verdict form to

15  the courtroom deputy and ask that the courtroom deputy publish the

16  verdict.

17          THE COURTROOM DEPUTY:  Members of the jury, please rise and

18  harken to your verdict.

19          In the case of the United States of America versus Troy

20  Douglas Brimm:

21          We, the jury, in the above-captioned case unanimously find

22  as follows:

23          As to Count One of the superseding indictment we find the

24  defendant, Troy Douglas Brimm, guilty;

25          As to Count Two of the superseding indictment we find the

1  defendant, Troy Douglas Brimm, guilty;

2         As to Count Three of the superseding indictment we find the

3  defendant, Troy Douglas Brimm, guilty.

4         So say we all this 29th day of August 2012; Michael C.

5  Blasberg, Foreperson.

6         THE COURT:  Please be seated.

7         Please poll the jury.

8         THE COURTROOM DEPUTY:  Members of the jury, as I ask you

9  the following question, please answer yes or no:

10        Is the verdict as read your true verdict, Juror No. 1?

11        JUROR NO. 1:  Yes.

12        THE COURTROOM DEPUTY:  No. 2?

13        JUROR NO. 2:  Yes.

14        THE COURTROOM DEPUTY:  No. 3?

15        JUROR NO. 3:  Yes.

16        THE COURTROOM DEPUTY:  No. 4?

17        JUROR NO. 4:  Yes.

18        THE COURTROOM DEPUTY:  No. 5?

19        JUROR NO. 5:  Yes.

20        THE COURTROOM DEPUTY:  No. 6?

21        JUROR NO. 6:  Yes.

22        THE COURTROOM DEPUTY:  No. 7?

23        JUROR NO. 7:  Yes.

24        THE COURTROOM DEPUTY:  No. 8?

25        JUROR NO. 8:  Yes.

1           THE COURTROOM DEPUTY:  No. 9?

2           JUROR NO. 9:  Yes.

3           THE COURTROOM DEPUTY:  No. 10?

4           JUROR NO. 10:  Yes.

5           THE COURTROOM DEPUTY:  No. 11?

6           JUROR NO. 11:  Yes.

7           THE COURTROOM DEPUTY:  No. 12?

8           JUROR NO. 12:  Yes.

9           THE COURT:  Okay.  Ladies and gentlemen, first of all, let

10 me thank you again for your jury service and your willingness to

11 serve as jurors.  We appreciate it.

12          I hope you found your jury service to be an interesting and

13 educational experience.  It was a relatively short case, but

14 nevertheless, we appreciate the very careful consideration that you

15 gave to the case as the evidence was presented, as well as to your

16 conscientious deliberations.

17          I think you should leave here with every confidence that

18 your verdict was with substantial evidence to support your verdict

19 so you should not have hesitance to doubt your verdict.  Quite

20 frankly, I am not sure how you could have arrived at any other

21 verdict.

22          It was well tried by both sides.  Obviously, it was

23 disappointing for defense counsel, but they had a difficult case to

24 defend.

25          There is no need to call the code-a-phone this evening, but

1   I would ask that you call the code-a-phone tomorrow and you will get

2   instructions as to when or whether you will be back or called for

3   jury service for the remainder of that two-week period of time that

4   you were summoned for jury service.

5              With that and our thanks, have a pleasant rest of the day

6   and afternoon and you are free to go.

7              Thank you very much.

8              The courtroom deputy will escort you out.  Thank you.

9   Sorry I couldn't have been more helpful on that question.

10             (Thereupon, the jury exited the courtroom.)

11         All right.  Mr. Brimm, the jury has returned a verdict of

12  guilty as to each of the three counts of the superseding indictment.

13             Accordingly, this Court hereby adjudicates you guilty as to

14  those three counts.

15             The next phase of the proceedings is sentencing.  You will

16  be asked to give information to the probation officer.  Your

17  attorney can be present with you if you wish.

18             You will also be given an opportunity to read the

19  presentence investigation report along with your attorney to file

20  any objections to the report before the sentencing and at the time

21  of sentencing.

22             You, and your attorney on your behalf, will be given the

23  opportunity to address the Court respect to sentencing.

24             The Court set sentencing for September 6, 2012 at 2:00 p.m.

25             Okay.  Is there anything further that we need to take up

1  now?

2         MS. MEDETIS:  Nothing from the Government, Your Honor.

3         MR. PADILLA:  Nothing, Judge.  Thank you.

4         THE COURT:  Okay.  If you just stand by, we will get you

5  the exhibits and have them returned to you for safekeeping.

6         Thank you.

7         (Thereupon, the proceedings concluded.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE


I hereby certify that the foregoing is an accurate transcript of the proceedings in the above-entitled matter.



10/12/12                      Bonnie Joy Lewis,
                      Registered Professional Reporter
                         CASE LAW REPORTING, INC.
                         7001 Southwest 13 Street,
                       Pembroke Pines, Florida 33023
                            954-985-8875